Ben JEWELL, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S00–8709–CR–870.

Supreme Court of Indiana.

June 23, 1989.

Richard D. Gilroy, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., John D. Shuman, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant–Appellant Ben Jewell was convicted of Murder, a felony, by a jury in the Marion Superior Court. He was sentenced to thirty (30) years to be served at the Department of Corrections. Jewell appeals and raises the following issues:

1. error by the trial court in refusing to tender Jewell's instructions to the jury regarding lesser included offenses; and

2. insufficient evidence to sustain Jewell's conviction for murder.

On the evening of December 21, 1985, the decedent, Robin Newboldt, a twenty-six (26) year old mother of three, attended a family Christmas party with her children at the home of her sister, Audrey Marie Wilson. Later that evening, Jewell, a sixty (60) year old man who had known Robin since she was a child, picked up Robin and her ten (10) year old son, Glenn Chatman, and drove them to his apartment.

The three arrived at Jewell's home and Jewell entered the apartment to get some food. Robin and Glenn stayed in Jewell's truck while he was gone. A short time later, Jewell came back outside and told Robin and Glenn there was no food in the house. Robin and Glenn then entered the apartment with Jewell to look for the food. All they found were some "greens."

According to Glenn's eyewitness testimony, an argument then ensued between his mother and Jewell. It was the first "real argument" between the two that Glenn had seen. Although both used foul language, there was no evidence of a physical struggle. Jewell went into his bedroom and returned with a gun, which Glenn described as being "long and black and on the side you put a bullet in and you close it back up." Jewell then stated he was "tired of it" and shot Robin. After seeing his mother shot, Glenn ran out of the apartment and two blocks over to his grandmother's house and called the police.

Officer Linda Roeschlein arrived at Jewell's apartment shortly before 1:00 a.m. on December 22, 1985. When the officer arrived, she saw the body of a black female lying on the floor with an obvious injury to the head area, with steam emanating therefrom. At or about the same time, Officer Marta Bell found the victim's son Glenn in the 1900 block of North College, approximately two (2) blocks from Jewell's apartment. Glenn told Officer Bell that "Ben" had shot his mommy in the head. Glenn directed Officer Bell to Jewell's apartment at 2015 North College, where she found the victim shot in the head. Officer Bell then put Glenn into the back of her patrol car.

Glenn made a formal videotaped statement approximately one and one-half (1½) hours later at police headquarters. Glenn's videotaped statement was admitted into evidence without objection and played to the jury.

A second videotape, prepared during the early morning hours of December 22, 1985, which purported to depict the inside of Jewell's apartment and the spatial dimensions of the rooms contained therein, was admitted into evidence over Jewell's objection and played to the jury.

A forensic expert testified that Robin died as a result of a shotgun wound to the head and brain inflicted from a distance of a few feet away. Further evidence included a twelve (12) gauge single barrel shotgun found lying on a mattress in the basement of Jewell's building; two (2) spent twelve (12) gauge shotgun shells, one recovered from the chamber of the shotgun (for number eight (8) load pellets) and the other found in the hallway of Jewell's apartment (for number six (6) load pellets); twelve (12) gauge shotgun wadding found behind the front door of Jewell's apartment; lead pellet fragments from a number eight (8) size shot recovered from both Jewell's living room floor and from the head of the victim. Expert testimony from a firearm and toolmark examiner revealed the spent shotgun shell retrieved from the chamber of the shotgun was fired from that gun. With regard to the spent shotgun shell found in the hall of Jewell's apartment, the expert testified that the shell "could have been fired" from the shotgun in question.

The evidence was contradictory as to whether the shotgun in question belonged to Jewell. Fingerprint tests on the shotgun were negative. On cross-examination, however, Jewell's own son identified the shotgun as belonging to Jewell. Jewell, who testified on his own behalf, stated that he marked his guns with the initials "BJ" on the stock, and denied that the shotgun in evidence belonged to him.

Jewell also denied taking any part in the shooting. In fact, his relationship with Robin was such that he considered her to

be "just like a daughter." Moreover, Jewell not only denied shooting Robin, he denied even being angry at her, despite the fact they had an argument immediately prior to her being shot.

Jewell claimed Robin was shot by an intruder in his apartment. He testified his apartment had been broken into earlier that evening. He had reported the burglary to the police. Officer Ernest R. Hudson, Jr., of the Indianapolis Police Department testified that he responded to the call when it was radioed in at approximately 9:55 p.m. that evening. Jewell claimed that two weapons, a twelve (12) gauge single shot shotgun and a Remington twenty-two (22) bolt action rifle, among other items, were taken during this burglary.

After Robin had argued over the missing food, Jewell stated he picked up the telephone to report it missing. As he began to call the police, an intruder appeared from behind a green couch in the living room and aimed a shotgun at his head. Jewell dropped the telephone, grabbed the barrel of the shotgun, and struggled with the intruder. The shotgun discharged over Jewell's head and the blast purportedly hit above a window. The intruder threw Jewell against the kitchen stove. Jewell then ran out the back door of the apartment. The intruder gave chase, but could not find Jewell because he hid under a tarpaulin and rug beneath an outdoor staircase. Five to ten minutes later, Jewell heard a second shot fired. He did not come out from hiding the entire night.

Jewell testified he and Robin had been good friends for a number of years. Indeed, even Robin's son Glenn stated he called Jewell "Pops" and he was known as "Mr. Ben" or "Gentle Ben" by the young people in the neighborhood. Robin's family did not fear Jewell, rather, he had helped Robin and her family move into their house and he even helped pay some of the rent. As Jewell got older, Robin would even cook some of his meals and visit on occasion. In time, however, Jewell testified she had cast a "voodoo spell" over him.

Jewell claimed Robin tainted the food she prepared for him by urinating in cornbread she baked and by putting her own blood in chocolate cake she made for him. Even after he knew the food was tainted, Jewell continued to eat it because he could not help himself. Believing Robin had him possessed, in his own words, he could not get away from her to save his life.

Jewell was sixty-two (62) years old when the trial was held. There was some evidence Jewell had contracted syphilis and was treated for it in 1949, but it is unclear whether he was completely cured. Jewell also suffered a blow to the head from a work-related accident which resulted in his seeking psychiatric treatment. Jewell stated that on December 20, 1985, two days before the date Robin was killed, he had been to the psychiatrist who gave him tranquilizers to help him rest.

Two medical doctors testified on the issue of insanity. Dr. Larry M. Davis, M.D., a psychiatrist, testified that in his opinion, in all probability Jewell was sane at the time of the offense. Dr. Ronald Hull, a physician specializing in psychiatry, also testified that, in his opinion, Jewell was "legally of sound mind" at the time of the alleged offense.

With regard to the inconsistent testimony relating to the shooting itself, Dr. Davis explained it was "a very distinct possibility" that Jewell confabulated his story.

I

Jewell contends the trial court erred in its refusal to instruct the jury regarding voluntary manslaughter and involuntary manslaughter. The trial court gave an instruction on murder and insanity as a complete defense. Additionally, the jury was instructed that if the facts allowed it, they could find Jewell guilty but mentally ill. The jury found Jewell guilty of murder in the fatal shooting of Robin Newbolt.

■ Jury instructions lie largely within the trial court's discretion. *Dennie v. State* (1988), Ind., 524 N.E.2d 273, 274; *Walker v. State* (1986), Ind., 497 N.E.2d 543, 545. Error in a particular instruction will not properly justify reversal unless the error is of such a nature that the whole

charge of which it forms a part misleads the jury as to the law of the case. *Dennie,* 524 N.E.2d at 274–75; *Walker,* 497 N.E.2d at 545; *Grossenbacher v. State* (1984), Ind., 468 N.E.2d 1056, 1059.

In *Leary v. State* (1988), Ind., 524 N.E.2d 307, 309, the law on tendering instructions regarding lesser included offenses was stated:

> The test for determining whether it was error to refuse an instruction on a lesser included offense is two-fold: 1) did the language of the statute and the charging document necessarily include the lesser offense in the greater; and 2) was evidence introduced at trial to which the included offense instruction was applicable. *Salahuddin v. State* (1986), Ind., 492 N.E.2d 292, 294. Furthermore, the evidence must be subject to interpretation not only that the lesser offense was committed, but also that the greater offense was not. *Id.; Tawney v. State* (1982), Ind., 439 N.E.2d 582, 587, *reh. denied* (1982).

*See also Roland v. State* (1986), Ind., 501 N.E.2d 1034, 1039.

Voluntary manslaughter and involuntary manslaughter are both generally lesser included offenses of murder. But there must also be evidence introduced at trial to prove the lesser offense. *Leary,* 524 N.E.2d at 309–10; *Bedgood v. State* (1985), Ind., 477 N.E.2d 869, 872.

■ Jewell's tendered instruction on voluntary manslaughter read as follows:

*Instruction No. 1*

The crime of voluntary manslaughter is defined by statute as follows:

A person who knowingly or intentionally kills another human being while acting under sudden heat commits voluntary manslaughter, a Class B felony.

The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder to voluntary manslaughter.

To convict the defendant the State must have proved each of the following elements:

The defendant
1. Knowingly or intentionally
2. Killed
3. Another human being.

If the State failed to prove each of these elements beyond a reasonable doubt, you should find the defendant not guilty.

If the State did prove each of these elements beyond a reasonable doubt, and you further find the defendant did the killing while acting under sudden heat, you should find the defendant guilty of voluntary manslaughter, a Class B felony.

Glenn Chatman, the victim's ten (10) year old son who was an eyewitness to the shooting, testified that his mother and Jewell got into an argument over some missing food. Although she used "foul language" and called Jewell some bad names, Jewell himself testified that he did not become angry with the victim *at any time* on the night of the occurrence. Jewell put it this way at page 342 of the Record:

Q. ——were you angry with Robin at any time on this evening?

A. No. I never been angry at her. We never been angry at one another.

Q. Did you have any reason to want to hurt her?

A. No, I have no reason.

Moreover, Jewell went on to state that Robin was the only one arguing, and even that *her arguing did not make him mad.* Here is how Jewell himself testified at pages 352–54 of the Record:

Q. Okay. And then at that point, isn't it true that there was an argument between you and Robin?

A. Wasn't nothing between me. She's the one started arguing. *I didn't argue about the stuff.*

Q. Oh. You didn't argue but she did?

A. The only thing I told her, I said, "In the morning, I'll go to the store and get us some more stuff."

\* \* \* \* \* \*

Q. All right. And [Glenn] hears you two arguing, right?

A. No, he didn't hear me arguing. He heard her arguing.

Q. Okay. Only she was arguing?

A. Only one, she was arguing.

Q. *And didn't that make you mad?*

A. *No.*

[Emphasis added.]

But even if the jury completely disregarded Jewell's testimony and found that he did argue and get angry with the victim, there was no evidence of sudden intense passion that might be presumed to obscure Jewell's reason and render him incapable of rational thought. Words standing alone are insufficient provocation to produce sudden heat. *Sears v. State* (1986), Ind., 494 N.E.2d 1286, 1287; *Fowler v. State* (1985), Ind., 483 N.E.2d 739, 744; *Van Orden v. State* (1984), Ind., 469 N.E.2d 1153, 1160, *cert. denied* (1985), 471 U.S. 1104, 105 S.Ct. 2335, 85 L.Ed.2d 851. Therefore, even if the jury believed that Jewell became angry during this argument, it would not justify a finding of guilty of voluntary manslaughter.

■ The same is true of involuntary manslaughter. Jewell's tendered instruction was:

*Instruction No. 2*

The crime of involuntary manslaughter is defined by statute as follows:

A person who kills another human being while committing or attempting' to commit: a Class C or Class D felony that inherently poses a risk of serious bodily injury; a Class A misdemeanor that inherently poses a risk of serious bodily injury; or battery commits involuntary manslaughter, a Class C felony. However, if the killing results from the operation of a vehicle, the offense is a Class D felony.

To convict the defendant the State must have proved each of the following elements:

The defendant

1. [K]illed
2. Another human being
3. While committing or attempting to commit:

A Class C or Class D felony that inherently poses a risk of serious bodily injury, or

A Class A misdemeanor that inherently poses a risk of serious bodily injury, or battery.

If the state failed to prove each of these elements beyond a reasonable doubt, you should find the defendant not guilty.

If the state did prove each of these elements beyond a reasonable doubt, you should find the defendant guilty of involuntary manslaughter, a Class C Felony.

or

If the State did prove each of these elements beyond a reasonable doubt and you find that the killing was a result of the operation of a vehicle, you should find the defendant guilty of involuntary manslaughter, a Class D felony.

Although this instruction sets forth the language of the involuntary manslaughter statute, it is confusing and unclear because it does not set forth exactly what Class C or Class D felony, or what Class A misdemeanor, inherently posing a risk of serious bodily injury, Jewell was supposed to have been committing when the shooting took place. Nowhere are the elements of a battery defined, in this or any other tendered instruction. Moreover, there was no evidence presented that the killing resulted from the operation of a motor vehicle. It is true that involuntary manslaughter may be a lesser included offense of murder. *Mireles v. State* (1973), 261 Ind. 64, 68, 300 N.E.2d 350, 352; *Williams v. State* (1969), 252 Ind. 154, 246 N.E.2d 762. In order for it to be required to give an included offense charge, however, there must be evidence from which the jury could properly find the lesser offense was committed while the greater was not. *Leary*, 524 N.E.2d at 309; *Dennie*, 524 N.E.2d at 275.

■ There is no evidence from which the jury could reasonably find Jewell guilty of involuntary manslaughter. There was eyewitness testimony from the victim's son that Jewell shot the victim in the head with a shotgun. Jewell's claim that it was an intruder, not he, who shot the victim does

not bring the facts within the definition of the tendered instruction. The trial court was justified in determining the tendered instruction was inconsistent with Jewell's own testimony that he denied the shooting entirely. Either Jewell was the one who purposely and intentionally killed Robin or he was not. The evidence presented to the jury was not subject to the interpretation the lesser offense was committed and the greater was not. *Leary,* 524 N.E.2d at 309; *Dennie,* 524 N.E.2d at 275.

## II

Jewell next contends the jury's verdict was not supported by sufficient evidence. In reviewing a sufficiency question we do not weigh the evidence or judge credibility but are constrained to consider only that evidence most favorable to the State together with all reasonable and logical inferences to be drawn therefrom. If there is substantial evidence of probative value to support the conclusion of the trier of fact the verdict will not be overturned. *Leary,* 524 N.E.2d at 309; *Alfaro v. State* (1985), Ind., 478 N.E.2d 670, 672. The elements of the offense of murder which must be proved by the State beyond a reasonable doubt are that the defendant knowingly or intentionally killed another human being.

The testimony from the victim's son, an eyewitness to the shooting, was that Jewell argued with his mother over some missing food, went into his bedroom, returned with a shotgun, stated words to the effect he was tired of it, and shot the victim in the head. The fact that Jewell claims the victim was shot by an intruder goes to the weight and credibility of his testimony. Jewell raised insanity as a complete defense to the crime charged, and the jury was instructed accordingly. Two expert witnesses, both medical doctors specializing in psychiatry, testified that in their expert opinion Jewell was in all probability legally sane at the time of the offense. Jewell contends that on this direct appeal "the verdict of the jury ignores the testimony of Dr. Davis in this case." Quite to the contrary, Dr. Davis not only testified that, in his opinion, Jewell was legally sane at the

time of the alleged occurrence, but went on to testify, without objection, that it was a "very distinct possibility" that Jewell's story could be "explained by a process called confabulation."

Here is how Dr. Davis put it at pages 388–89 of the Record:

I consider Mr. Jewell's case [to be] a little more complicated than some.... [I]t was very difficult to understand how [Jewell] could believe a detailed story of an assailant and at the same time the Court record having evidence that placed him directly involved in the shooting. *That can be explained by a process called confabulation* where the——an individual has memory deficits from whatever reason, over time begins to develop an unconscious process of filling in the blanks with detailed information. So that my conclusion in my original report to the Court during 1986 was that *confabulation had to be considered as a very distinct possibility to try to explain the tremendous inconsistencies I was seeing.*

[Emphasis added.]

Dr. Davis explained the process of confabulation in further detail at page 397 of the Record:

Confabulation is not a criminal process that a defendant necessarily uses. It normally is a process for a progressive organic brain syndrome or general deterioration of brain function that occurs over time, generally in an older individual who has learned to compensate for memory deficits by essentially automatically and unconsciously filling in the blanks.

In this case, the jury heard testimony from the victim's son who witnessed the shooting when he was ten (10) years old. A conviction may be sustained on the uncorroborated testimony of a single witness. *Slaughter v. State* (1988), Ind., 531 N.E.2d 185, 186; *Mullins v. State* (1987), Ind., 504 N.E.2d 570, 573. There was sufficient evidence before the jury for them to conclude

Jewell purposely and intentionally killed the victim.

The trial court is affirmed.

SHEPARD, C.J., and DeBRULER, GIVAN and DICKSON, JJ., concur.