Steven KOLLAR, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 71A03–8906–CR–217.

Court of Appeals of Indiana,
Third District.

June 25, 1990.

Mark A. Lienhoop, Newby, Lewis, Kaminski & Jones, LaPorte, for appellant.

Linley E. Pearson, Atty. Gen., Lisa M. Paunicka, Deputy Atty. Gen., Indianapolis, for appellee.

STATON, Judge.

Steven Kollar was convicted by a St. Joseph Superior Court jury of five counts of theft, a class D felony,[1] and one count of corrupt business influence, a class C felony.[2] Kollar raises three issues on appeal:

1. Whether the evidence was sufficient to sustain his convictions?
2. Whether he was denied the effective assistance of counsel?
3. Whether the trial court erred in imposing his sentence?

We affirm.

Kollar owned and operated a coin shop in LaPorte, Indiana. In 1982, Kollar established what he termed a "one percent plan," whereby customers would purchase silver which was maintained at the coin shop. In return for the use of the silver, Kollar would pay one percent (1%) interest per month to the participants of the plan. Under the terms of the plan, the silver was available for price liquidation at any marketable hour. Too, the silver could be returned to the customer at any time with proper written notice.

---

1. West's AIC 35–43–4–2(a).

2. West's AIC 35–45–6–2(a)(3).

In September of 1986, four gold boxes of coins worth approximately $212,000 were stolen from Kollar's store. Despite this reversal, business continued until June of 1987, when Kollar received several bad checks at a coin show. Kollar's coin shop closed shortly thereafter. The following is a synopsis of the transactions Kollar engaged in during the lifetime of his coin business which directly led to his convictions of theft and corrupt business influence.

On February 6, 1984, Dennis Gerrard purchased 100 ounces of silver under the "one percent plan." He later purchased another 300 ounces of silver. Gerrard received his monthly interest payments until Kollar's coin shop went out of business in June of 1987. The next month, Gerrard attempted to reclaim his four hundred ounces of silver. At that time, Kollar asked Gerrard to give him several weeks to obtain the silver. Kollar later tendered excuses as to why the silver had not been obtained. Gerrard never received his silver. He later obtained a judgment in small claims court against Kollar for $3,000.00.

Jim Eggleston entered the "one percent plan" in 1985 with a purchase of 1,470 ounces of silver. Eggleston paid $9,996.00 for the silver. In early 1986, Eggleston advised Kollar that he wanted out of the "one percent plan." After numerous delays and excuses offered by Kollar, Eggleston received only 200 ounces of silver. His loss was approximately $11,162.00.

On April 22, 1987, Frank Horvath paid Kollar for 12 ounces of gold and 800 ounces of silver. Horvath received the majority of the metals, but he did not receive two ounces of gold worth approximately $930.00. Horvath later received a judgment against Kollar in small claims court.

Also in April of 1987, Dean Bixler agreed to purchase 719 ounces of silver from Kollar. Bixler paid Kollar a total of $5,024.00 for the silver, but received only four hundred and ninety-seven (497) ounces of his silver. When Bixler requested the remaining silver, Kollar gave numerous excuses for its unavailability. Bixler later obtained a small claims judgment against Kollar for $1,864.80.

Marla and William Spies agreed to buy 738 ounces of silver from Kollar in May of 1987. The Spies' paid $5,998.40 at that time, and were told by Kollar that they could have their silver in two weeks. After two weeks had passed, Kollar informed the Spies that he was experiencing difficulty with the buyer and requested more time. The Spies later received 200 ounces of silver, but never received the remainder of their purchase. Their loss was approximately $4,000.00.

Several witnesses were presented at trial who had also participated in the "one percent plan" but had never received their principal investment. One of these witnesses had received neither his principal investment nor his interest payments. Additionally, David Henrickson, an expert in the field of coin and precious metals dealing, testified that it was neither economically feasible nor commonly accepted practice for a coin and precious metal dealer to retain precious metal and pay the customer one percent interest per month. In the expert witness' opinion, the "one percent plan" was similar to a pyramid scheme and Kollar should have "seen the writing on the wall" at least one year in advance. (Record at 253, 254.)

## I.

### Sufficiency

Kollar first contends that the evidence was insufficient to support his convictions of five counts of theft and one count of corrupt business influence. To facilitate an orderly review of the question of whether Kollar's theft convictions are supported by sufficient evidence, we must first clarify a misconception regarding the elements of theft upon which the bulk of Kollar's arguments are premised.

"Theft" is defined as:

... knowingly or intentionally exert[ing] unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use ...

IC 35–43–4–2(a). Control over the property of another is "unauthorized" if it is exerted:

\* \* \* \* \* \*

(4) by creating or confirming a false impression in the other person; [or]

\* \* \* \* \* \*

(6) by promising performance that the person knows will not be performed;

\* \* \* \* \* \*

IC 35–43–4–1(b).

■ Kollar was charged and convicted of theft under IC 35–43–4–1(b)(6), i.e., theft "by promising performance that the person knows will not be performed." However, Kollar argues that, according to *Miller v. State* (1989), Ind.App., 535 N.E.2d 170, *reh. denied*, the State must also prove that a defendant "created or confirmed a false impression in the other person" pursuant to IC 35–43–4–1(b)(4) in order to prove theft under IC 35–43–4–1(b)(6). As Kollar correctly points out, a conviction of theft by false pretenses under IC 35–43–4–1(b)(4) requires a showing that misrepresentations as to past or present facts were made in order to gain possession of another's property. Convictions under this subparagraph cannot be premised upon misrepresentations which were promissory in nature, such as promises to repay loans. *Coburn v. State* (1984), Ind.App., 461 N.E.2d 1154, 1156–1157. However, we conclude that Kollar's interpretation of *Miller* is erroneous; proof of an offense defined under IC 35–43–4–1(b)(6) does not also require proof of the offense defined in IC 35–43–4–1(b)(4).

In *Miller*, we held that any specification in the charge of theft under a particular subparagraph of IC 35–43–4–1(b) is surplusage and cannot result in a fatal variance between the charge and the proof. We added that the various enumerated incarnations of "unauthorized control" supported this conclusion because they do not purport to be mutually exclusive. The following improvident language was used to illustrate this point and was seized upon by Kollar in forming his arguments:

For example, promising performance under (6) certainly creates a false impression under (4) that vitiates any consent under (1) and represents an exertion of control in an unintended manner under (2).

*Miller, supra* at 171. "Promising performance that the person knows will not be performed" under subparagraph (6) does not create a "false impression" under subparagraph (4), since proof of the creation of a "false impression" definitionally excludes the promise of future performance. To an extent, subparagraph (6) can be considered to "pick up" where subparagraph (4) ends. Thus, we disregard Kollar's contentions of insufficient evidence based upon failure to prove misrepresentation of past or existing fact.

■ The key to the offense of theft by promising performance that the person knows will not be performed is the intent of the person when he secures control of the property. *Miller, supra* at 172. In order to have met its burden under this subsection, the State must have proven beyond a reasonable doubt that Kollar knew at the time he procured the money from his victim that his promises would not be performed. *Id.* On appeal, we do not reweigh the evidence or judge the credibility of witnesses. In sufficiency cases, we look exclusively to the evidence most favorable to the State and all inferences logically drawn therefrom. If there is substantial evidence of probative value to support the conviction, it will be affirmed. *Jewell v. State* (1989), Ind., 539 N.E.2d 959, 964.

■ Kollar argues that the evidence does not support a conclusion that he had the intent to deprive Gerrard and Eggleston of their money or silver at the times their separate purchases occurred. Kollar argues that the 1% plans purchased by Gerrard and Eggleston occurred prior to the theft of the $212,000 worth of gold coins from his business, and thus that he could not have been aware at the time of the purchases that he would be unable to honor their repayment requests. However, the record shows that the gold coins were stolen in September of 1986. Eggleston

requested the return of his silver in February of 1986, at which time Kollar told Eggleston that he would comply with his request. In August of 1986, after repeated phone calls and attendant excuses, Kollar produced only 200 of the 1,470 ounces of silver owed. All of this preceded the alleged financially crippling theft of the gold coins. Too, Kollar's behavior in failing to produce Eggleston's principal investment and providing numerous excuses for that failure was distinctly similar to his behavior with investors who made their purchases throughout the lifetime of his business. From this, the jury was entitled to infer that Kollar never intended to return silver purchased and placed in his keep under the 1% plan. Intent may be proved by circumstantial evidence. *Anglin v. State* (1986), Ind., 490 N.E.2d 721, 723.

Kollar argues that the remaining purchases upon which his theft charges were based occurred prior to the receipt of the bad checks which forced the close of his business in June of 1987, and thus that intent to deprive was not shown because he could not have foreseen that circumstance. Kollar also argues that the financial reversals suffered by the gold theft in 1986, which preceded the remaining purchases, did not prove a knowing intent to deprive because he had suffered a larger reversal in the past and had recovered from it completely. We are unpersuaded.

Horvath, Bixler and Spies purchased silver and gold from Kollar in April and May of 1987. The purchasers were told they would receive their silver or gold within a matter of weeks; the purchasers' attempts to recover the full amount of their purchases were met with excuses for non-payment which both preceded and post-dated the receipt of the bad checks. In fact, Spies was eventually told that her money had been used to pay for "someone else's stuff." Record at 231. Hendrickson testified that common business practice would have placed the metal with the purchasers within one week of order. He also testified that Kollar would have realized that he could not meet his commitments up to one year prior to these purchases.

■ The record shows that Kollar repeatedly accepted money from purchasers, promised delivery of goods within short periods of time, then lulled purchasers with excuses why delivery was not had and made fractional delivery of purchases. This pattern began prior to Kollar's initial financial reversals and continued well after he should have been aware that his business was failing. This is sufficient to support the inference that Kollar never intended to deliver the precious metals Horvath, Bixler and Spies purchased from him. These convictions are affirmed.

■ Kollar also argues that his conviction of corrupt business influence is unsupported by the evidence. Kollar contends that, because the evidence underlying his theft convictions is insufficient, his corrupt business influence based upon those offenses cannot stand. As we concluded that the evidence is sufficient to support the underlying offenses, this argument is a nullity. However, Kollar also argues that there nonetheless is insufficient evidence regarding a "pattern of racketeering activity" to support his conviction. We disagree.

Kollar was charged with violating West's AIC 35–45–6–2(a)(3) which reads:

A person ... who is employed by or associated with an enterprise, and who knowingly or intentionally conducts or otherwise participates in the activities of that enterprise through a pattern of racketeering activity, ... commits corrupt business influence, a Class C felony.

A "pattern of racketeering activity" means: engaging in at least two (2) incidents of racketeering activity that have the same or similar intent, result, accomplice, victim, or method of commission, or that are otherwise interrelated by distinguishing characteristics that are not isolated incidents. . . .

IC 35–45–6–1. In defining "pattern of racketeering" in the context of the federal Racketeer Influenced and Corrupt Organization Act (RICO), after which our RICO act is patterned, the United States Supreme Court concluded that proof of the same required a showing that the racketeering predicates are related and they amount to

or pose a threat of continued criminal activity. *H.J. Inc. v. Northwestern Bell Telephone Co.* (1989), —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195; *Dellenbach v. State* (1987), Ind.App., 508 N.E.2d 1309.

Kollar contends that: 1) there is no showing that the two one percent plan transactions and the three other purchases were "related"; and 2) that there was no showing of a threat of continued criminal activity since his business was closed and no transactions occurred after that closing. We disagree. A relationship is established between predicates in this case by the common thread of Kollar accepting payment for metals, promising delivery of the metals within a short period of time or on demand, and failing to deliver all or parts of the purchases. The threat of continued activity is shown by the lengthy duration of the scheme prior to closing of the coin shop and Kollar's stated intention to continue in the coin business. The State proved multiple predicate acts and a pattern of racketeering activity. The evidence is therefore sufficient to convict Kollar of corrupt business influence.

## II.

### *Ineffective Assistance of Counsel*

 Kollar secondly contends he was denied effective assistance of counsel. In order to prove this claim, Kollar must overcome a strong presumption of competence on the part of counsel. Only strong and convincing evidence will overcome this presumption. *Terry v. State* (1984), Ind., 465 N.E.2d 1085, 1089. The standard for counsel's performance is that of reasonably effective assistance as measured by prevailing professional norms. *Wickliffe v. State* (1988), Ind., 523 N.E.2d 1385, 1387. Isolated poor strategy, mistakes, bad tactics or inexperience do not necessarily establish ineffective assistance of counsel. *Terry, supra.* A successful claim of ineffective assistance of counsel is established when a defendant shows that his attorney's performance was deficient and that his defense was prejudiced by counsel's poor performance. *Lopez v. State* (1988), Ind., 527 N.E.2d 1119, 1129.

 Kollar contends that trial counsel's four requests for continuances and failure to depose or interview Hendrickson prior to trial evidence a lack of preparedness which operated to the detriment of his defense. However, Kollar does not direct this court to specific instances showing that trial counsel was unprepared to try the case when it went to trial or attempt to show that a pretrial interview would have enabled trial counsel to better cross-examine Hendrickson. Kollar fails to show deficient performance on the part of trial counsel or prejudice resulting therefrom, and therefore has not shown ineffective assistance of counsel.

During the course of trial, trial counsel for Kollar was granted leave to add Robert L. Rush as an expert witness for the defense to counterpoint what proved to be unfavorable expert testimony by State's witness Hendrickson. Rush was present to testify on the second day of trial, but he was not called before trial recessed. Rush was not subpoenaed to appear the following day and in fact did not appear. No other expert testimony was offered by the defense.

 Kollar claims ineffective assistance of counsel in trial counsel's failure to subpoena Rush. Kollar argues that Rush would have contradicted Hendrickson's testimony concerning customary practices in the coin and precious metal business and thus provide support for Kollar's position that the losses suffered by his clients were due to poor business judgment rather than an intent to steal.

The substance of the proffer Kollar made at trial was that Rush would testify that contrary to Hendrickson's position, some dealers retain precious metal belonging to others and pay interest thereon. Kollar also stated that Rush would testify that Hendrickson himself had lent precious metal to other people and charged interest. However, Hendrickson himself admitted on cross-examination that, while the one percent plan was not commonly accepted business practice, it was economically feasible where consistently high volume business

occurred. We cannot conclude that Rush's testimony would have added significantly to this revelation. In addition, practice of offering the one-percent plan itself was not on trial. Rather, it was the manner in which Kollar utilized the metals placed in his possession under this plan which resulted in several of his theft convictions. There is nothing to suggest that Rush would testify that it was common business practice to offer a "one percent" plan to customers and then fail to return their silver pursuant to the terms of the agreement. In order to ascertain whether trial counsel's performance was deficient, we must look to the totality of the evidence to determine whether there is a reasonable probability that but for counsel's errors, the outcome would have been different. *Messer v. State* (1987), Ind.App., 509 N.E.2d 249, 253, *reh. denied, trans. denied.* In light of the evidence previously summarized, we cannot conclude that Rush's testimony would have altered the jury's conclusion that at the time Kollar entered into the questioned transactions, he did not intend to return the silver to its rightful owners.

### III.

### *Sentencing*

Finally, Kollar contends that the trial court erred in imposing sentence by: 1) failing to consider certain mitigating circumstances; 2) considering several improper aggravating circumstances; 3) imposing an unreasonable and excessive term of imprisonment; and 4) ordering restitution without entering requisite findings. We affirm Kollar's sentence with regard to his first three allegations of error but remand for entry of findings regarding Kollar's ability to pay restitution and establishment of the manner of performance.

In addressing claims regarding the propriety of a sentence, we are bound by the standard of review set forth in Indiana Rules for Appellate Procedure, Rule 17(B) which states:

(1) The reviewing court will not revise a sentence authorized by statute except where such sentence is manifestly unrea-

sonable in light of the nature of the offense and the character of the offender.

(2) A sentence is not manifestly unreasonable unless no reasonable person could find such sentence appropriate to the particular offense and offender for which such sentence was imposed.

The trial judge identified the following aggravating and mitigating circumstances in pronouncing sentence:

The Court has considered matters in aggravation and mitigation and finds that the defendant is a young person, there was no physical violence. These are matters in mitigation. However, the Court finds that the defendant participated in a long enduring scheme to defraud portions of the public who were comprised of persons who were investing typically their savings toward their future or the future of their children and the Court finds the particular scheme involved which preyed on the saving investments of these persons is a matter in aggravation. Moreover, the Court finds that the defendant's pattern of lulling victims while encouraging other new victims is a matter in aggravation. The Court finds further that the amounts of losses suffered particularly by Mr. Eggleston, Mr. Bixler and the Spees [sic] are significant amounts and together with the timing of the losses that was occasioned by the defendant, are matters in aggravation. The Court finds that the matters in aggravation outweigh the matters in mitigation.

Record at 112–113. In complex form, simplified for our purposes, the trial court then sentenced Kollar to: the presumptive term of five years enhanced by three years for aggravating circumstances for corrupt business influence; the presumptive two years for his Count II theft conviction to be served concurrently with his corrupt business influence conviction; the presumptive two years for each of his theft convictions under Counts II through V, to be served consecutively to his corrupt business influence conviction and to each other; and the presumptive two years enhanced by two

years for aggravating circumstances on his theft conviction under Count VI. After suspending portions of this sentence, the trial court entered an executed sentence of sixteen years imprisonment.

■ Kollar contends the trial court failed to consider the additional mitigating circumstances that he was indigent, remorseful, had no prior criminal record, had built his business since the age of 15, and had an outstanding business reputation until his business began to fail. However, the trial court has broad discretion in sentencing and is not required to acknowledge or adopt all mitigating circumstances argued by a defendant. *Hammons v. State* (1986), Ind., 493 N.E.2d 1250, 1255, *reh. denied*, 496 N.E.2d 1284. In this case, the trial judge apparently considered the additional alleged mitigating circumstances to be insignificant. We are not persuaded that he abused his discretion in this regard.

Kollar also contends the trial court considered improper factors as aggravating circumstances. Specifically, Kollar claims that it was improper to consider that he participated in a "long enduring scheme" that was a "pattern" because they are elements of his corrupt business influence conviction. *See Linger v. State* (1987), Ind. App., 508 N.E.2d 56. He also claims the finding that the "amount and timing of the losses was significant" was improper because it is a generality which does not specify why the particular offenses required an enhanced sentence. *See St. John v. State* (1988), Ind., 523 N.E.2d 1353.

■ We need not address these contentions on their merits because the trial court identified other aggravating circumstances sufficient to support Kollar's sentence. The trial court's findings that Kollar: defrauded "portions of the public who were comprised of persons who were investing typically their savings toward their future or the future of their children"; lulled certain victims while encouraging others to invest; and stole significant amounts of money from those victims constitute particularized findings regarding the nature and circumstances of the crimes committed as contemplated by West's AIC 35-38-1-

7(a)(2). This is sufficient to support the imposition of the enhanced and consecutive sentences. *See Henderson v. State* (1986), Ind., 489 N.E.2d 68, 72 ("[w]hen the record indicates that the trial judge engaged in the evaluative processes but simply did not sufficiently articulate his reasons for enhancing sentence and the record indicates that the sentence imposed was not manifestly unreasonable, then the purposes underlying the specificity requirement have been satisfied").

■ Kollar contends his sentence was disproportionate to the severity of financial losses suffered in this case, citing *Cunningham v. State* (1984), Ind.App., 469 N.E.2d 1, *reh. denied, trans. denied*, in favor of this proposition. In *Cunningham*, the defendant was given an executed sentence of 16 years in prison for the crimes of illegally obtaining food stamps (theft) and perjury. The defendant's convictions rested upon his failure to disclose outside income sources. Noting that the crimes charged as felonies in that case were frequently prosecuted as misdemeanors in this state and in view of the overwhelming mitigating circumstances, which included the fact that the defendant had five children dependent on him for support, we concluded that the sentence was manifestly unreasonable in light of the offense and the offender. We cannot conclude the same in the case before us.

The aggravating circumstances enumerated by the court, including the significant amounts of money lost by three investors, Kollar's pattern of lulling certain victims while encouraging more to invest, and theft of money saved for investing in the future, place these crimes apart from those in *Cunningham*. The theft of food stamps is what is considered a victimless crime. The crimes before us were directed toward a number of people who lost significant portions of their future security at Kollar's hands. We cannot consider the sentence manifestly unreasonable in light of this fact.

■ Finally, Kollar contends and the State concedes that the trial court erred in

ordering him to pay restitution to the victims without determining whether he was capable of making restitution or specifying manner of payment. IC 35–38–2–2(a)(5) requires that, when restitution or reparation is a condition of probation, as here, the court "shall fix the amount ... and ... manner of performance." The trial court must also determine the defendant's ability to pay the amount of restitution ordered. *Maxwell v. State* (1983), Ind.App., 455 N.E.2d 1171, 1176, *trans. denied.* In failing to enter such findings, the trial court abused its discretion.

The convictions are affirmed. The cause is remanded to the trial court with instructions to ascertain the defendant's ability to make restitution and fix manner of payment.

GARRARD, J., concurs.

MILLER, J., dissents in part with separate opinion.

MILLER, Judge, dissenting.

I dissent on issues 1 and 3.

First, I believe there was insufficient evidence to support Kollar's conviction on Count II, one of the predicate offenses underlying Count I (racketeering). Second, the aggravating circumstances recited by the trial court in support of enhanced and consecutive sentences are both improper—merely restatements of elements of the charged crimes—and insufficiently particularized.

In Count II, Kollar was charged with theft from Dennis Gerrard. Theft occurs when an accused secures control over property of another by promising performance the accused *knows* will not be performed. IND.CODE 35–43–4–1. The key is the intent of the accused at the time he secures control of the property. *Miller v. State* (1989), Ind.App., 535 N.E.2d 170. Count II charges Kollar with exerting unauthorized control over Gerard's property on specific dates. Each date was prior to the failure of Kollar's business.

Gerrard entered the one percent plan on February 6, 1984, by buying 100 ounces of silver. He made additional purchases of silver on December 17, 1984, December 31, 1984 and June 15, 1985. Kollar paid the one percent interest until he went out of business, but he did not deliver the silver purchased by Gerrard. Gerrard obtained a judgment for $3,000 which Kollar owed him. There is no evidence to support an inference that Kollar, *at the time Gerrard made the purchases*, knew he would be unable to deliver the silver. Instead, the evidence shows that at that time Kollar had ample income from other business sources to purchase the silver. The one percent plan was only a part of Kollar's business. Hendrickson testified that the one percent plan could work for several years, but that Kollar should have known the plan would not work at least a year before it collapsed. However, Gerrard made his last purchase in 1985—two years before the business failed. Unlike the charge involving the Egglestons, there is no evidence or reasonable inference therefrom that Kollar knew he would be unable to deliver Gerrard's silver when Gerrard made the purchases. *See Coburn v. State* (1984), Ind.App., 461 N.E.2d 1154 (a misrepresentation as to future acts or events, or promissory in character, will not support a conviction for theft). Therefore, I would reverse the conviction on Count II.

I would also reverse on Count I, corrupt business influence, (RICO) because the evidence is insufficient to support a conviction on Count II. To sustain a conviction on Count I there must be a finding by the jury of at least two incidents of racketeering activity. IC 35–45–6–2(a)(3). In this case we have a general judgment and we do not know which two predicate offenses the jury considered as supporting the conviction for Count I.

Federal cases which have examined this issue support the holding that a RICO conviction predicated on multiple racketeering acts cannot stand where the evidence of any one of the underlying acts is legally insufficient and the court is unable to determine which acts formed the basis for the RICO conviction. *U.S. v. Vastola* (3rd Cir. 1990) 899 F.2d 211; *U.S. v. Brown* (3rd Cir.1978), 583 F.2d 659, *cert. denied,* 440

U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979).

The present case is identical to the situation in *Brown, supra*. The defendants were convicted of four counts of mail fraud and two counts of the federal RICO statute.[1] The Court of Appeals reversed two of the predicate counts of mail fraud because of insufficient evidence. The court then reversed the RICO counts stating:

> The Jury in this case might have relied on either Counts 5 or 6 [the two mail fraud counts] for which we have found insufficient evidence in reaching its verdict of guilty under Counts 13 and 14 [the racketeering counts]. Accordingly, we must reverse the convictions of both defendants under these two counts.

*Id.* at 669–670 (footnote omitted).

We observe that in Brown there remained two proper underlying predicate offenses which could have supported the RICO charges; and, still, the court reversed. In the present case, where the jury was instructed it needed to find only two predicate offenses were committed as part of a scheme, we cannot know which two offenses the jury found as the basis for the racketeering conviction. I would, therefore, reverse and remand on this issue.

I also dissent on the issue of sentencing. The majority concludes:

> The trial court's findings that Kollar: defrauded "portions of the public who were comprised of persons who were investing typically their savings toward their future or the future of their children"; lulled certain victims while encouraging others to invest; and stole significant amounts of money from those victims constitute particularized findings regarding the nature and circumstances of the crimes committed as contemplated by West's AIC 35–38–1–7(a)(2). This is sufficient to support the imposition of the enhanced and consecutive sentences.

(Maj. opinion at 943). I disagree.

First, I note that this court has exhibited some confusion in identifying non-statutory aggravating circumstances which are sufficient to support enhancement or consecutive sentences. For example, in *Campbell v. State* (1990), Ind.App., 551 N.E.2d 1164, the defendant business manager for Indiana University–Kokomo campus stole $257,908.00 from the University over a period of five years. The trial court found the following aggravating circumstances:

1. That the defendant, Richard L. Campbell, violated his position of trust within the University;

2. That Richard L. Campbell violated a position of trust and confidence that he had created within the local community;

3. That the crimes to which Richard Campbell has pled Guilty have a multitude of victims, (i.e. Indiana University, fellow administrators and teachers, taxpayers of the State of Indiana, the reputation of Indiana University, and last but not least, the students);

4. Further, the crime to which Richard Campbell has been found Guilty was committed in secrecy. That it was a plan to deceive others which involved the building by Richard Campbell of a pattern of trust within the University and community and was a continuing pattern of violation of that trust.

The majority held that the first three reasons were proper aggravating circumstances, but that the fact that the crime was committed in secrecy was not, because "substantially all crimes involving theft and forgery are committed in secrecy." In his dissent, Judge Sullivan argued that a violation of trust is "the very essence of the acts of theft and forgery," citing *Linger v. State* (1987), Ind.App., 508 N.E.2d 56, in which this court held that theft from an employer was not a proper aggravating circumstance. Judge Sullivan also argued:

> The trial court further erred in translating the inferred moral outrage or sense of disappointment within the geographical and academic communities into a conclusion that these groups were actual victims of the criminal offenses. Such is tantamount to stating that every crime committed should carry an enhanced sen-

---

**1.** 18 U.S.C. § 1962.

tence because all society is the victim of crime.

Although I agree with Judge Sullivan, *Campbell* is illustrative of the problem faced by this court when reviewing non-statutory aggravating circumstances. The problem stems from the essentially *ad hoc* consideration of such circumstances. I believe this court should articulate a general rule for determining the propriety of non-statutory aggravating circumstances. In order to support enhanced or consecutive sentences the aggravating circumstance should be one not normally associated with the crime charged. This court and our supreme court have generally followed this rule, however it requires further explanation. Our supreme court has held that the mere recitation of a element of the crime does not justify enhanced or consecutive sentences. *Townsend v. State* (1986), Ind., 498 N.E.2d 1198. *See also, Linger, supra.* In addition, circumstances which are common to the commission of the charged crime are not proper aggravating circumstances. *Campbell, supra.*

Here, the aggravating circumstances listed by the trial court are either elements of the crime or are common to all such crimes. The trial court found as an aggravating circumstance that Kollar defrauded "portions of the public who were comprised of persons who were investing typically their savings toward their future or the future of their children." Most people who invest do so for their future. This is the reason for investment. How is the theft of savings for the future worse that the theft of savings for a new car or a long awaited vacation? For that matter, why is the source of the investment relevant? Are people who use borrowed funds to invest less entitled to protection that those who use their savings? There is no evidence that Kollar targeted people who were investing their savings. In all theft cases the victim is deprived of money or other property which he could have used for other purposes. While all victims of theft are deprived of their property, the value that they place on such property is irrelevant. A victim may be far more distressed by the theft of his grandmother's wedding ring, than the theft of a television, but this is no justification for imposing a greater sentence for the theft of the ring. To do so would result in highly unpredictable sentencing based solely on the trial court's perception of the value of the property to the victim.[2]

The trial court also found that Kollar's "*pattern* of lulling victims while encouraging other new victims is a matter of aggravation*". (Emphasis added). This is merely a restatement of one of the elements of the corrupt business influence charge—a "pattern of racketeering activity", IND.CODE § 35-45-6-2(a)(3). In addition, it is a restatement of one of the definitions of theft —"creating or confirming a false impression in the other person." IND.CODE § 35-43-4-1(b)(4). In *Linger, supra,* this court noted that the legislature has chosen not to differentiate between the various forms of theft. As the *Linger* court explained:

> This is analogous to differentiating among the forms of theft included in our general theft statute. *Townsend* recognizes that the trial court may consider the particularized circumstances of the crime's factual elements, and the sen-

2. For example, in *Campbell, supra,* Campbell was charged with 162 counts of theft and forgery. Pursuant to a plea agreement, Campbell pleaded guilty to five counts. He stole more than $250,000 from Indiana University over a period of five years. Campbell engaged in a long enduring scheme to steal a substantial amount of money, yet he was sentenced to only two executed terms of five years each to be served consecutively. The sentences on the other three counts were suspended. Of course, a sentencing court cannot be expected to be aware of all sentences for similar crimes and to determine sentence by comparing the serious-

ness of the crime before it with those other crimes. Nevertheless, consideration of improper aggravating circumstances results in unpredictable and illogical sentencing. When the circumstances in *Campbell* and this case are compared, it is clear that Campbell stole a substantially greater sum over a longer period time, yet received a lesser sentence. Such results call into question the basic fairness of the judicial system. If non-statutory aggravating circumstances are limited to those circumstances not normally associated with the crime charged, such uneven results will be lessened or eliminated.

tence may be enhanced if an element is particularly egregious. We find that *Townsend* mandates the conclusion that the mere mention of the elements of the crime of theft, *e.g.* the theft was from an employer or the theft was from an innocent stranger, is not such a particularized circumstance as can be used to enhance a presumptive 2 year theft sentence. In effect, the trial judge in merely reciting an element as an automatic aggravating circumstance is legislating and creating an automatic four year sentence for that form of theft. Here, the trial court made clear that all thefts from employers were more serious than thefts from others and required an enhanced sentence. This was improper.

*Id.* at 64–65.

Here, the trial court has merely recited an element of the charges.

Finally, the trial court found that the losses were "significant." However, this is not a particularized finding. It may mean that the losses involved a substantial amount of money or it may mean that the losses caused financial difficulties for the victims. If we were to consider the amount of money taken as an aggravating circumstance, then it would be worse to steal $50,000 from a multimillionaire than to steal $50.00 from an elderly person living on social security. However, if we consider the impact on the victim the theft of $50.00 from the social security recipient is worse, as it may spell the difference between eating and going hungry.

In addition, the sentences imposed are inconsistent with the aggravating circumstances given. For example, the trial court found that the amount of loss suffered by Eggleston, Bixler and the Spies was significant; however, it sentenced Kollar to two years on the Eggleston charge, and three and four years, respectively, on the Bixler and Spies charges despite the fact that Eggleston lost a substantially greater amount than either Bixler or the Spies. The trial court also sentenced Kollar to two years concurrent on the Gerrard charge even though Gerrard lost more money than both Horvath (consecutive sentence) and Bixler (enhanced and consecutive sentence). I fail to find any logical support for these sentences.

Finally, Kollar argues the trial court failed to consider mitigating circumstances. The trial court found two mitigating circumstances—Kollar's youth and the fact that the crimes were nonviolent. However, Kollar submitted over eighty letters to the trial court from people who knew him asking for leniency. The general theme of the letters was that Kollar had many admirable qualities, but was not a good businessman. The writers included Kollar's ex-wife, business associates, friends and and at least one former customer who had lost money because of Kollar's activities. These writers expressed the belief that Kollar, his family, and society would be better served if Kollar was not given a long term of incarceration. The trial court did not specifically mention these letters which were attached to the presentence report. In *Townsend, supra,* at 1202, our supreme court explained: "Failure to find mitigating circumstances when clearly supported by the record may reasonably give rise to a belief that they were overlooked, hence not properly considered." Here, there is no indication that the trial court considered the letters and the mitigating circumstances recited in them. This suggests that the trial court overlooked mitigating circumstances.

In conclusion, I find nothing in the aggravating circumstances given by the trial court which sets this crime apart from other crimes of the same type. In addition, the trial court has failed to consider mitigating circumstances supported by the record. Therefore, I dissent.